NATIONAL HARROW CO. v. HENCH et al.

(Circuit Court, E. D. Pennsylvania. August 25, 1896.)

MONOPOLIES—COMBINATION OF PATENT OWNERS.

A combination among manufacturers of spring-tooth harrows, by which each manufacturer assigns to a corporation organized for the purpose the patents under which he is operating, and takes back an exclusive license to make and sell the same style of harrows previously made by him, and no other, all the parties being bound to sell at uniform prices, *held* to be an unlawful combination for the enhancement of prices, and in restraint of trade.

Risley, Robinson & Love, for complainant.
Strawbridge & Taylor and John G. Johnson, for defendants.

ACHESON, Circuit Judge. The plaintiff, the National Harrow Company, seeks an injunction restraining the defendants, Hench & Dromgold, from selling float spring-tooth harrows, harrow frames, and attachments applicable thereto, upon more favorable terms as to price to purchasers thereof than the prices stipulated in two license contracts annexed to the bill, and a decree for the specific enforcement of said contracts, and for an accounting at the rate of five dollars for each harrow, etc., sold in violation of the terms of said license contracts.

Several defenses are insisted on, but in the view I take of the case it will be necessary to discuss only one of them, namely, that these license contracts are in unreasonable restraint of trade, and are part of an unlawful combination to control the manufacture of an important article of commerce, to destroy competition in the

sale thereof, and maintain high prices. The National Harrow Company, a corporation of the state of New York,—to whose contract rights and general purposes the plaintiff, a subsequently created New Jersey corporation, has succeeded,—originated in a written agreement between a number of leading and distinct manufacturers, under various United States letters patent of float spring-tooth harrows, whereby it was agreed that they should organize a corporation under the laws of New York, and would assign to the corporation all United States letters patent which they respectively then owned or should thereafter acquire relating to float spring-tooth harrows, and the good will of their business in such harrows, and that they would not thereafter be interested in the manufacture or sale of such harrows, except as agents or licensees of the corporation; that the corporation should issue to the persons, firms, and corporations, respectively, so assigning to it their said patents and the good will of their business, exclusive licenses to manufacture and sell upon their own account, subject to uniform terms and conditions, the same style of harrows which they were making and selling just prior to the agreement, and that the corporation itself would not manufacture and sell any style of harrows covered by its licenses; that each licensee should pay to the corporation one dollar on every float spring-tooth harrow manufactured and sold by such licensee, and that each person, firm, or corporation transferring to the corporation the good will of their float spring-tooth harrow business, and their patents relating thereto, should receive in payment therefor the value thereof as agreed upon or as fixed by arbitration in paid-up stock of the corporation. The agreement in the first instance was signed by six different manufacturers, but the contract contemplated and provided that others should come into the arrangement and become parties thereto. Accordingly, other manufacturers of float spring-tooth harrows soon joined the combination, which then embraced 22 different persons, firms, or corporations. Thus, almost the entire output of float spring-tooth harrows made in the United States was brought under the regulation and control of this organization, its licensees manufacturing and selling at least 90 per cent. thereof.

The defendants were the owners of two United States letters patent relating to float spring-tooth harrows, under which they had been manufacturing and selling harrows. They joined the combination, and, agreeably to the provisions of the above-recited agreement, they assigned to the New York corporation their patents, and that corporation then issued to the defendants a license to manufacture and sell their old style of harrows. The New Jersey corporation, which was formed in furtherance of the general scheme, issued to the defendants a second license on terms and conditions substantially like the former license. These are the two license contracts here sued on. The following stated provisions are common to both licenses: The defendants agree not to sell float spring-tooth harrows, float spring-tooth harrow frames without teeth, or attachments applicable thereto, at less prices or on more favorable terms of payment and delivery to the purchasers

than as is set forth in the schedule annexed to the license, unless the licensor should reduce the selling prices and make more favorable terms for purchasers, and that the defendants will not directly or indirectly manufacture or sell any other float spring-tooth harrows, etc., than those which they are thus licensed to sell and market, except for another licensee, and then only of such style as he is licensed to manufacture and sell. They agree to pay to the corporation one dollar upon each float spring-tooth harrow, etc., manufactured and sold by them agreeably to the terms of the license, and the sum of five dollars as liquidated damages for every harrow, etc., manufactured or sold by them contrary to the terms and provisions of the license, and the corporation agrees to defend all suits for alleged infringement brought against the licensees. All the licenses issued by the corporation are upon the like terms and conditions.

It will be perceived that the corporation through whose instrumentality the purposes of the combination are effected is simply clothed with the legal title to the assigned patents, while the several assignors are invested with the exclusive right to manufacture and sell their old style of harrows under their own patents; but all of them must sell at uniform prices and upon the same terms, without respect to cost or the merits of their respective styles of harrows, and all the members of the combination are strictly forbidden to manufacture or sell any other ·style or kind of float spring-tooth harrow than they are thus licensed to make and sell. Now, it is quite evident to me, as well by the papers themselves as from the testimony of witnesses, that this scheme was devised for the purpose of regulating and enhancing prices for float spring-tooth harrows, and controlling the manufacture thereof throughout the whole country, and that the combination, especially by force of the numbers engaged therein, tends to stifle all competition in an important branch of business. I am not aware that such a far-reaching combination as is here disclosed has ever been judicially sustained. On the contrary, the courts have repeatedly adjudged combinations between a number of persons engaged in the same general business to prevent competition among themselves, and maintain prices, to be against sound public policy, and therefore illegal. Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Pittsburg Carbon Co. v. McMillin, 119 N. Y. 46, 23 N. E. 530; Merz Capsule Co. v. United States Capsule Co., 67 Fed. 414; Nester v. Brewing Co., 161 Pa. St. 473, 29 Atl. 102.

I am not able to concur in the view that the principle of these cases is inapplicable here, because the agreement in question involves patents. It is true that a patentee has the exclusive control of his invention during the life of the patent. He may practice the invention or not, as he sees fit, and he may grant to others licenses upon his own terms. But where, as was the case here, a large number of independent manufacturing concerns are engaged in making and selling, under different patents and in various forms, an extensively used article, competition between them is the natural and inevitable result, and thereby the public interest is pro-

moted. Therefore, a combination between such manufacturers, which imposes a widespread restraint upon the trade, and destroys competition, is as injurious to the community, and as obnoxious to sound public policy, as if the confederates were dealing in unpatented articles. To the present case may well be applied the remarks of the supreme court of Pennsylvania in Morris Run Coal Co. v. Barclay Coal Co., supra: "This combination has a power in its confederated form which no individual action can confer." By the united action of more than a score of different manufacturers, natural and salutary competition is destroyed. To sanction such a result, because accomplished by a combination of patentees, would be, I think, to pervert the patent laws. Moreover, it is to be noted that under these license contracts the licensees can only make or sell their own specific form of harrow. All other forms, whether patented or unpatented, are prohibited to them. For this interdiction there is no justification. In the case of Harrow Co. v. Quick, 76 O. G. 1574, 67 Fed. 130, Judge Baker expressed the opinion that this combination was unlawful, and against sound public policy. I am constrained to regard the license contracts sued on as part of an illegal combination, and in unwarrantable restraint of trade. I must, therefore, deny the plaintiff the relief sought. The other defenses I need not consider.

The matter of the cross bill was not much noticed by counsel, if discussed at all. My conclusion is that the plaintiffs therein have not shown themselves to be entitled to affirmative relief. They entered into this combination voluntarily. The preliminary agreement does not remain executory in any particular. These cross plaintiffs do not owe any duty or service to the public, the performance of which is hindered by an improvident and unlawful contract. No special ground for equitable relief is disclosed by the cross bill, and the plaintiffs therein do not require a decree of cancellation in order to defend against suits based upon the license contracts. The cross bill will be dismissed, without prejudice to the right of the plaintiffs therein to defend against suits, or their right to maintain a bill should circumstances or exigencies arise to justify equitable interposition.

Let a decree be drawn in conformity with the views expressed in the foregoing opinion.