## NATIONAL HARROW CO. v. HENCH et al.

### (Circuit Court of Appeals, Third Circuit. October 29, 1897.)

### No. 30.

1. RESTRAINT OF TRADE—COMBINATION OF PATENTEES.

Numerous manufacturers, under various United States patents, of float spring-tooth harrows, agreed to organize a corporation, to assign to it all the patents thus owned or thereafter to be acquired, and the good will of their business, and not to be interested in the manufacture or sale of such harrows except as agents or licensees of the corporation; that the corporation should license them to manufacture and sell, for their own account, subject to uniform terms and conditions, their respective makes, and should not itself manufacture or sell; that each licensee should pay one dollar for each such harrow manufactured and sold by him, and should receive paid-up stock in return for the patents and good will. Those who entered the agreement represented 70 per cent. of the total manufacture and sales of the United States. The corporation was formed and the assignments made. The licenses issued also bound the licensees not to cut prices, not to sell other float spring-tooth harrows except under the licenses, and provided liquidated damages for every breach. *Held*, that the arrangement was an unlawful combination in restraint of trade.

2. SAME.

Though the fact that several patentees are exposed to litigation, justifies them in composing their differences, they cannot make the occasion an excuse or cloak for the creation of monopolies to the public disadvantage.

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

W. P. Quinn, for appellant.

John G. Johnson, for appellees.

Before DALLAS, Circuit Judge, and BUTLER and KIRKPAT-RICK, District Judges.

BUTLER, District Judge. The essential facts are well stated by the circuit court, as follows:

"The National Harrow Company, a corporation of the state of New York,—to whose contract rights and general purposes the plaintiff, a subsequently created New Jersey corporation, has succeeded,—originated in a written agreement between a number of leading and distinct manufacturers, under various United States letters patent, of float spring-tooth harrows, whereby it was agreed that they would organize a corporation under the laws of New York and would assign to the corporation all United States letters patent which they respectively then owned or should thereafter acquire relating to float spring-tooth harrows and the good will of their business in such harrows, and that they would not thereafter be interested in the manufacture or sale of such harrows except as agents or licensees of the corporation; that the corporation should issue to the persons, firms and corporations respectively so assigning to it their said patents and the good will of their business exclusive licenses to manufacture and sell upon their own account, subject to uniform terms and conditions, the same style of harrows which they were making and selling just prior to the agreement, and that the corporation itself would not manufacture and sell any style of harrows covered by its licenses; that each licensee should pay to the corporation one dollar on every float spring-tooth harrow manufactured and sold by such licensee, and that each person, firm, or corporation transferring to the corporation the good will of their float spring-tooth harrow business and their patents relating thereto, should receive in payment therefor the value thereof as agreed upon or as fixed by arbitration, in paid-up stock of the corporation.

"The agreement in the first instance was signed by six different manufacturers, but the contract contemplated and provided that others should come into the arrangement and become parties thereto. Accordingly other manufacturers of float spring-tooth harrows soon joined the combination, which then embraced twenty-two different persons, firms or corporations. Thus almost the entire output of float spring-tooth harrows made in the United States was brought under the regulation and control of this organization, its licensees manufacturing and selling at least 90 per cent. thereof.

"The defendants were the owners of two United States letters patent relating to float spring-tooth harrows, under which they had been manufacturing and selling harrows. They joined the combination, and, agreeably to the provisions of the above-recited agreement, they assigned to the New York corporation their patents, and that corporation then issued to the defendants a license to manufacture and sell their old style of harrows. The New Jersey corporation, which was formed in furtherance of the general scheme, issued to the defendants a second license in terms and conditions substantially like the former license. These are the two license contracts here sued on. The following stated provisions are common to both licenses: The defendants agree not to sell float spring-tooth harrows, float spring-tooth harrow frames without teeth, or attachments applicable thereto, at less prices or on more favorable terms of payment and delivery to the purchasers than is set forth in the schedule annexed to the license, unless the licensor should reduce the selling prices and make more favorable terms for purchasers, and that the defendants will not directly or indirectly manufacture or sell any other float spring-tooth harrows, etc., than those which they are thus licensed to sell and market except for another licensee, and then only of such style as he is licensed to manufacture and sell. They agree to pay to the corporation one dollar upon each float

spring-tooth harrow, etc., manufactured and sold by them, agreeably to the terms of the license, and the sum of five dollars as liquidated damages for every harrow, etc., manufactured or sold by them contrary to the terms and provisions of the license, and the corporation agrees to defend all suits for alleged infringement brought against the licensees. All the licenses issued by the corporation are upon the like terms and conditions."

[76 Fed. 667.]·

It is manifest, as well from the contract as from the proofs outside of it, that the purpose of the parties was to form a combination between the various manufacturers of these harrows, to prevent competition in business and enhance prices; and such is the effect of their agreement. The corporation, provided to hold the legal title of the several patents, is merely an instrument to effect this object. The prior owners are still the beneficial owners, with right to continue their business, subject only to the restraint in its management imposed by the contract. The provision for licenses is made necessary by the transfers of title, and is simply another part of the scheme for combination and control of the business of the several pat-·entees. The result would be the same in legal contemplation if the corporation and licenses had been dispensed with, and the contract had provided simply, as it does, for combination and restraint of competition. That such a contract would be unlawful seems clear. While it is true that all contracts in restraint of trade are not prohibited, and it is sometimes difficult to determine whether a particular one is, there is no room for doubt that such a contract as this, which provides for general and unlimited restraint, is unlawful. To justify restraint, reason for it must be found in the nature of the property or the situation of the parties, as, for instance, in the sale of a business or professional good will, and other similar cases. Even then the restraint must be confined within such reasonable limits as the circumstances require. Here there is nothing to justify restraint, and that imposed is without any limitation whatever. The fact that the property involved is covered by letters patent is urged as a justification; but we do not see how any importance can be attributed to this fact. Patents confer a monopoly as respects the property covered by them, but they confer no right upon the owners of several distinct patents to combine for the purpose of restraining competition and trade. Patented property does not differ in this respect from any other. The fact that one patentee may possess himself of several patents, and thus increase his monopoly, affords no support for an argument in favor of a combination by several distinct owners of such property to restrain manufacture, control sales, and enhance prices. Such combinations are conspiracies against the public interests, and abuses of patent privileges. The object of these privileges is to promote the public benefit, as well as to reward inventors. The suggestion that the contract is justified by the situation of the parties—their exposure to litigation—is entitled to no greater weight. Patentees may compose their differences, as the owners of other property may, but they cannot make the occasion an excuse or cloak for the creation of monopolies to the public disadvantage. We do not see anything to distinguish this case, in principle, from Nester v. Brewing Co., 161 Pa. St. 473 [29 Atl. 102]; Carbon Co. v. McMillin, 119 N. Y. 46 [23 N. E.

530]; Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St. 173; Distilling & Cattle Feeding Co. v. People [Ill. Sup.] 41 N. E. 188; Straiht v. Harrow Co. [Sup.] 18 N. Y. Supp. 233. The last of these cases arose out of this contract under circumstances substantially like those of the case before us. A similar conclusion was reached by the court in Harrow Co. v. Quick, 67 Fed. 130, where this contract was involved. The doctrine of these cases is not new, and we feel no hesitation in applying it to the contract before us.

The judgment is therefore affirmed.