ROBERT H. INGERSOLL & BRO. v. McCOLL.

(District Court, D. Minnesota, Third Division. March 17, 1913.)

1. MONOPOLIES (§ 17*)—PATENTS—LICENSE—VALIDITY OF PRICE RESTRICTION.
    If a license restriction imposed by the owner of a patent is not for the purpose of protecting the patent or for securing its benefits, but for the purpose of evading the Anti-Trust Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), it is void.
    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

2. MONOPOLIES (§ 17*)—PATENTS—LICENSE—VALIDITY OF PRICE RESTRICTIONS.
    Complainants make and sell, under different trade-names, watches containing parts which are patented. Each watch is placed in a box, and on some of the boxes is printed a notice or so-called license, restriction by which complainants attempt to control the price at which the watch may be sold by jobbers and retailers under penalty of being charged with infringement of the patents. Others of the watches, sold under different trade-names, but having the same mechanism and containing the same patented parts, are sold without any restriction. *Held*, that such restrictions were clearly not intended to protect the use of the patents or the monopoly which the law confers upon them, but for the protection of certain of the trade-marks, and that a purchaser who had no contract relations with complainants was not bound thereby.
    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 13; Dec. Dig. § 17.*]

In Equity. Suit by Robert H. Ingersoll & Bro. against Henry McColl. On final hearing. Decree for defendant.

Edward S. Rogers, of Chicago, Ill., and E. S. Stringer, of St. Paul, Minn., for plaintiff.

C. D. O'Brien, of St. Paul, Minn., for defendant.

. WILLARD, District Judge. This is a suit for the infringement of patent No. 787,041, granted April 11, 1905, for improvements in lantern pinions used in watches; patent No. 855,950, granted June 4, 1907, for improvements in lever escapements used in watches; patent No. 926,329, granted June 29, 1909, for improvements in watches relating to stem-winding and setting; and patent No. 958,987, granted May 24, 1910, for improvements in center frictions in watches. The infringement is said to consist in this:

The plaintiffs are owners of the patents. They cause to be manufactured for them a watch known under three names, "Ingersoll Dollar Watch," "Yankee Dollar Watch," and "Yankee." This they sell to jobbers, who sell to retail merchants. Each watch is packed in a box, on the outside cover of which is pasted the following notice:

"License.

"Robt. H. Ingersoll & Bro., Makers, New York, Chicago, London,
San Francisco.

"Mechanism in this watch is covered by United States patents, and the watch is licensed and sold under and subject to the following conditions, assented to by purchase and controlling all sales and uses thereof, any viola-

tion of which license conditions revokes and terminates all rights and license as to this and all other watches of makers in violator's possession, and subjects the violator to suit for infringement of said letters patent:

"(1) Jobbers may sell only to retail dealers, may not sell to any one designated by makers as objectionable, may not detach or sell without this notice, and may sell only at rates specified in schedules furnished by makers.

"(2) Retailers may advertise and sell only to buyers for use at ONE DOLLAR.

"(3) No donation, discount, rebate, premium, or bonus may be allowed or given in connection with any sale at wholesale or retail.

"(4) Guarantee, with date of sale indorsed thereon, to accompany each watch."

The defendant, a retail druggist in St. Paul, never bought any watches from the plaintiffs, and never had any contractual relations with them. He did, however, buy from a jobber in Duluth several of the Yankee watches, advertised them for sale in his store at 83 cents each, and sold them at that price. He knew at the time of so advertising and selling them of the license restriction imposed by the plaintiffs in regard to the price. The prayer of the bill is that he be enjoined from selling a Yankee watch for less than $1, and for damages and profits.

The real question in the case is whether this is a suit to protect a trade-mark, or one to protect a patent.

The Supreme Court of the United States has not yet directly decided that such a price restriction upon a patented article is binding upon a person who has entered into no contractual relation with the patentee. Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 345, 28 Sup. Ct. 722, 52 L. Ed. 1086; Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 402, 31 Sup. Ct. 376, 55 L. Ed. 502. Nor has the Circuit Court of Appeals of this circuit so decided, but that court in the case of National Phonograph Co. v. Schlegel, 128 Fed. 733, 64 C. C. A. 594, did hold that such a price restriction could be enforced against a person who had entered into contractual relations with the owner of the patent.

But although the owner of a patent may control the price of the patented article, it does not follow that the owner of a trade-mark can do so. No such power is vested in the owner of a copyright. Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086. The owner of an unpatented medicine cannot control the price in the hands of retail dealers with whom he has no contractual relations. An attempt to do so would be a violation of the Anti-Trust Law. Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502. It is very clear that the owner of a trade-mark is in no better position than the owner of a copyright. If this suit is really for the protection of a trade-mark, it cannot be maintained. Nor can it be maintained on the ground of any contractual relation between the plaintiffs and the defendant, because there was none.

Can it be maintained on the ground that the purpose is to protect a patent? In E. Bement & Sons v. National Harrow Co., 186 U. S. 70, on page 92, 22 Sup. Ct. 747, on page 756 (46 L. Ed. 1058), the court said:

"But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act (Sherman Act) we have no doubt was never contemplated by its framers."

In Henry v. Dick Co., 224 U. S. 1, on page 31, 32 Sup. Ct. 364, on page 372 (56 L. Ed. 645), the court said:

"If the stipulation in an agreement between patentees and dealers in patented articles, which, among other things, fixed a price below which the patented articles should not be sold, would be a reasonable and valid condition, it must follow that any other reasonable stipulation, not inherently violative of some substantive law, imposed by a patentee as part of a sale of a patented machine, would be equally valid and enforceable."

In Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. ——, decided by the Supreme Court November 18, 1912, the court said:

"The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman Law. It had, therefore, a purpose and accomplished a result not shown in the Bement Case. There was a contention in that case that the contract of the National Harrow Company with Bement & Sons was a part of a contract and combination with many other companies, and constituted a violation of the Sherman Law; but the fact was not established, and the case was treated as one between the particular parties, the one granting and the other receiving a right to use a patented article with conditions suitable to protect such use and secure its benefits. And there is nothing in Henry v. A. B. Dick Co., 224 U. S. 1 [32 Sup. Ct. 364, 56 L. Ed. 645], which contravenes the views herein expressed."

[1] From these authorities the rule to be deduced is this: If the license restriction is imposed, not for the purpose of protecting the patent or for securing its benefits, but for the purpose of evading the provisions of the Anti-Trust Act, then it is void, because such restriction is not "a reasonable condition imposed upon the licensee of a patent by the owner thereof," nor is it "a condition suitable to protect the use of a patent and secure its benefits."

It is necessary, therefore, to examine the evidence to see what the real purpose of the license restriction is in this case. Putnam, a witness for the plaintiffs, has been connected with their business for 15 or 16 years, and is, and for more than 10 years has been, their general sales manager. He testified, among other things, as follows:

"Q. Please state what the fact has been, and is, in reference to the use of the complainant during this period of trade-marks and brand names in connection with the manufacture and sale of its products, and if trade-marks or brand names have been used thereon, please give some of the principal names employed. A. The general name under which its principal watch products have been sold is 'Ingersoll.' Different classes or grades of watches have been given identifying names, each of which has been largely advertised and has become a trade-mark for such particular watch. These names as now and recently used are 'Yankee,' 'Eclipse,' 'Midget,' and 'Junior.' There are and have been other names, but they are not in such common or large use.

"Q. Please state whether these names 'Ingersoll,' or the universal general trade-mark name for the product, and the names 'Yankee,' 'Eclipse,' 'Junior,' 'Midget,' and other names, have been in any way advertised as trade-mark

or brand names of the product? A. Each of such names has been largely advertised; the name 'Yankee' has been very largely advertised.

"Q. Of these different trade-mark names, 'Yankee,' 'Eclipse,' 'Junior,' 'Midget,' which has been the most extensively advertised? A. 'Yankee,' or, as it has been commonly known and advertised, the 'Dollar Watch.'

"Q. About when was the name 'Yankee" adopted by the complainant as a trade-mark name for a part of its product? A. Some time prior to 1897.

"Q. At the time of its adoption, and since, has this name 'Yankee' been applied to a watch of particular construction? By that I mean distinctive construction, although it may have varied at different times? A. Yes.

"Q. At the time that the word 'Yankee' was adopted as a trade-mark name, and during the period that it was so adopted by the complainant, has there been a retail selling price for such Yankee watch, designated and requested to be employed and used by retailers? If so, please state what this retail selling price was. A. Since 1897 or thereabouts, there has been such retail selling price, and it was at that time and ever since one dollar.

"Q. How has this fact of one dollar being indicated and requested as the retail selling price been employed in connection with the Yankee watch in advertising it to the trade and public? By that I mean has this term 'Dollar Watch' come to be associated with the Ingersoll Yankee watch as a trade-mark name or phrase? A. It has.

"Q. Please explain to what extent, if any, the term 'Dollar Watch' has become associated with and is now used, if at all, as a trade-mark name or phrase for the Ingersoll Yankee watch in advertising by the plaintiff, by the trade, and by the public. A. It is my opinion, based upon observations and knowledge, that the term 'Dollar Watch,' as applied to the Yankee watch, has lost, if it ever had, a monetary significance to the trade or to the public, and it is my belief that the two terms interchangeably used—'Dollar Watch' and 'Yankee Watch'—as trade-marks are associated definitely in the public mind with the same watch, the principal Ingersoll product in watches.

"Q. Please state to what extent, if any, the term 'Dollar Watch' has been employed since 1897 in advertising the Ingersoll Dollar watch. A. In almost every advertisement and show card the term 'Dollar Watch' has been used, and usually in such advertising and show cards the picture of a watch has been shown, on which watch has appeared the trade-mark 'Yankee.' During the period referred to in the question, much more than a million dollars has been expended in the various ways referred to in my answer to question 17, and the largest part of such sum has been directed to the advertising of the Yankee or Dollar watch.

"Q. During this period, has the newspaper or magazine advertising of the Ingersoll Watch contained the term 'Dollar Watch,' and, if so, in a general way to what extent? A. Almost always.

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*

"Q. Referring to the license shown upon the box marked 'Exhibit F,' containing the watch marked 'Exhibit G,' referred to Saturday in the testimony of Arthur H. Brown, please state, if you know, the date at which this license system was adopted, connected with the manufacture or sale of the Ingersoll Yankee or Dollar watch. A. In this particular form, this license system was adopted about six years ago.

\*          \*          \*          \*          \*          \*          \*          \*          \*          \*

"Q. Please state the fact as to whether, prior to the adoption of this license system some six years since, in connection with the Yankee or Dollar watch, this watch, under the name 'Ingersoll Yankee,' 'Yankee,' 'Ingersoll Dollar Watch,' or 'Dollar Watch,' had obtained any reputation, either in the trade or with the public. A. I can perhaps best answer this question by stating that in the year 1899 about one-half million Ingersoll Yankee watches were sold, and that the sale thereof increased yearly until in 1905 or thereabouts the sale had reached at least a million of these Ingersoll Yankee or Ingersoll Dollar watches. They were handled by many thousands of merchants throughout the United States and foreign countries.

"Q. About what is the annual output of the Ingersoll Yankee or Dollar watch at present? A. About 2,000,000 per year."

He further testified that the Yankee or Dollar watch, since it was put upon the market in about 1897, contained mechanism covered by letters patent of the United States. In that connection he also said:

"Q. Have any notices of the dates or numbers of the patents covering the mechanism embodied therein been placed upon the watches? If so, please state where. A. For a great many years past, and I believe always, each Yankee watch has had stamped upon it the word 'patented' and the dates of such patents as from time to time they existed in such watch. Such notice has usually been stamped upon that part of watch known as the barrel bridge, which is, commonly speaking, a part of the rear movement plate or rear of the watch movement."

He further said:

"Q. What was the occasion or reason, if any, for the adoption by the complainant of this license system for the Ingersoll Yankee or Dollar watch, if you know? A. About 1899, or possibly 1900, when the sale of this Ingersoll Yankee watch or Ingersoll Dollar watch had reached into many hundreds of thousands, a few merchants, both retailers and jobbers, sought to take advantage of the reputation of this watch, established by large advertising and large sale, by offering it to the public or to the trade, as the case might be, at less than the prices which the complainant had fixed upon for such watches. This caused protests from merchants, both retailers and jobbers, throughout the country, who threatened, if such cut prices were allowed to continue, that they would cease handling and dealing in and buying from the complainant this Ingersoll Yankee watch. Thereupon complainant, knowing that its continuance as a business organization for the manufacture and sale of watches depended upon the good will of these merchants, both jobbers and retailers, and the continued and continuous buying, handling, and selling by them of this watch, cast about for a plan by which it could properly and lawfully fix, determine, and control the price at which this Yankee watch might be sold by the merchants, both retailers and wholesalers, and, having found what, in their opinion was a proper means, determined upon and did adopt such means, out of which this present license system later grew.

"Q. Prior to the adoption of the license system in its present or original form, did the complainant have a means of controlling the prices of the Ingersoll Yankee or Dollar watch in the hand of dealers, or did it simply indicate the prices at which it desired the dealers to sell, without any means of enforcing such prices? A. While always indicating the price, it knew of no means, and believed it had no means, of controlling such prices.

"Q. And until the license system was adopted, it was simply optional with the dealers to observe these prices, I understand? A. If you mean by 'license system' any system which the complainant had adopted, including the system adopted about 1899 or 1900, the answer is 'Yes.'

"Q. I understand that a license system was adopted about 1899 or 1900, which after various modifications about six years since took the present form? A. That is correct."

This testimony strongly indicates that the purpose of the plaintiffs was to protect the trade-mark, and that the patented improvements placed in the watch were of little or no consequence. There were always in the watch such patented improvements, but they were not always the same. The dates of patents placed upon the interior mechanism of the watch varied from time to time. The license system was adopted in 1900, but the earliest one of the patents in suit was not granted until 1905. The case of these same plaintiffs against Snellenberg (C. C.) 147 Fed. 522, indicates that further evidence in support of the inference drawn from the testimony already in the case might

have been obtained. The purpose of that suit was the same as the purpose of this suit. One of the patents there involved was for an improvement in escapement mechanism, and was issued in December, 1890; that patent expired in 1907. The escapement patent here in suit was granted on June 4, 1907. The other patent in that suit was for an improved clock pinion, and was granted in January, 1891. That patent expired in 1908. The lantern pinion patent in this suit was granted on April 11, 1905. The plaintiffs make a high-grade watch, which contains none of the mechanism covered by the patents in suit.

There has been no judicial determination of the validity of any one of them. There has been no litigation concerning any one of them. No testimony was presented by the plaintiffs to show that any one of the patents was of any value. The defendant produced as a witness a watchmaker of 30 years' experience, who testified that there was nothing new in any of them. The plaintiffs presented no evidence in rebuttal. There is nothing in the case to show what patents relating to the subject-matter of these improvements were granted prior to the patents in suit. While the defendant's watchmaker testified that he understood the scope of the claims of two of the patents, yet it appeared that one at least of the other two he had never read. His evidence probably is not sufficient to overcome the presumption of novelty and utility created by the issuance of the patents.

The most important evidence, however, remains to be stated. In addition to the Yankee, Eclipse, Midget, and Junior, the plaintiffs sell other watches, one of which is called the Defiance. These watches, according to Putnam, have probably hundreds of special names. One of the watches offered in evidence was called the McColl, and was so named at the request of the defendant. He bought 27 dozen Yankee watches and 18 dozen of the other kind. He paid 65 cents each for the Yankee and 55 cents each for the McColl watches. The Defiance and the McColl contain the same mechanism as the Yankee. The parts of the Yankee and the parts of the McColl and the Defiance are interchangeable. In fact, it is the same watch under three different names. The barrel plates of the Defiance and the McColl contain the dates of all the patents in suit. There is nothing on either of these watches to indicate that the plaintiffs are in any way connected with them. They are sold without any license restriction, such as it attached to the sale of the Yankee. While the purchaser of the Yankee is required to sell it for not less than $1, a purchaser of identically the same watch, if it is called the Defiance or the McColl, can sell it for any price he chooses.

If the purpose of the license restriction were to secure the benefits of the patents, no sound reason can be given why it should not have been applied to the watch when it is called the Defiance, as well as when it is called the Yankee. It is very evident that the plaintiffs care nothing for the patents. They say in one of their briefs:

"A point was made at the argument that complainant makes three watches under different names and embodies in them the same patents, and that only one of them, the Yankee watch, is sold under the license restriction. What inference it is sought to draw from this fact is not apparent. Complainant, having a complete monopoly under the statute, is not bound to

exercise all of it. It may release any part of it that it sees fit and reserve the rest. If it wishes to release the 'Defiance' and the 'McColl' watches entirely from the patent monopoly by unrestricted sale, and retain a portion of its monopoly of sale with respect to the Yankee watch, it may do so."

The right of a patentee to do what he may please to do with the patented article is not unrestricted. It is limited in the manner indicated by the cases hereinbefore cited. He cannot impose upon a purchaser a condition which is unreasonable. He cannot impose an unreasonable condition, for the purpose of enabling him to violate the Anti-Trust Act. It appears from the evidence in this case that the license restriction so imposed on the sale of the Yankee watch is not for the purpose of securing the benefits of the patented improvements therein, but in order that the plaintiffs may protect the trade-mark or trade-name under which they sell the watch. Such a condition was not imposed "to protect the use of the patent or the monopoly which the law conferred upon it." It is an unreasonable one, is beyond the power of the plaintiffs to impose upon the defendant, and is void as to him. Whether or not it would be valid if the defendant had made a contract directly with the plaintiffs, and thereby bound himself not to sell the Yankee watch for less than $1, it is not necessary to decide.

Let the bill be dismissed, with costs