## A. B. DICK CO. v. UNDERWOOD TYPEWRITER CO.

### (District Court, S. D. New York. October 18, 1917.)

1. PATENTS ⊙═65—DESCRIPTION.
The patent law requires certainty of expression and a mere conjectural allusion or ambiguous reference to the subject-matter of a later patent contained in a prior will not overcome the validity of the later one.

2. PATENTS ⊙═58—ANTICIPATION—BURDEN OF PROOF.
The burden of proving anticipation of a patent alleged to be infringed is on defendant, and in case of reasonable doubt, the doubt must be resolved against anticipation.

3. PATENTS ⊙═124—CLAIMS—MULTIPLICITY.
Multiplication of the claims of a patent which relate to the same subject-matter and are both broad and specific, being undoubtedly phrased to protect the patentee against any possible prior inventions which might amount to anticipation, does not invalidate the patent.

4. PATENTS ⊙═328—VALIDITY—INFRINGEMENT.
Fuller patent, No. 1,101,268, for a stencil blank capable of being stencilized, consisting of a dry but hygroscopic sheet of fibrous material impregnated with a coagulated colloidal substance and a tempering agent, and No. 1,101,269, for a process of forming a stencil sheet, which consists in impregnating a sheet of fibrous material with a colloidal substance, rendering such substance normally nonplastic, but capable of being temporarily softened, *held* valid, not being anticipated, and, except as to claims 23 and 24 of the first patent, to be infringed.

5. PATENTS ⊙═328—INFRINGEMENT—WHAT CONSTITUTES.
Fuller patent, No. 1,101,270, for a method of preparing duplicate stencils, consisting of a particular method of drying the stencil sheet after it has been cut and moistened, whereby the opening in the sheet made in forming the letters or figures is enlarged, *held* not to show invention, and not to be infringed.

In Equity. Bill by the A. B. Dick Company against the Underwood Typewriter Company. Decree in part for complainant, and for defendant in part.

See, also, 235 Fed. 300.

Samuel Owen Edmonds, of New York City (J. Edgar Bull, of New York City, of counsel), for plaintiff.

Briesen & Schrenk, of New York City (Hans v. Briesen and Fred A. Klein, both of New York City, of counsel), for defendant.

HAZEL, District Judge. Bill for injunction and accounting for infringement of patents No. 1,101,268, for an article of manufacture, No. 1,101,269, for the process of making the same, and No. 1,101,270, for the method of preparing duplicating stencils, granted on June 23, 1914, to Louis E. Fuller, patentee and assignor of complainant. The art of producing a stencil, consisting of a sheet of paper or other fabric upon which letters or figures were formed by writing, cutting, or perforating, was known long before the grant of the patents in question. In 1874 Zuccato received a British patent (No. 3,150) for a chemical process of reproducing writing, a so-called papyrograph, which was made of a closely woven sheet of paper, sized and saturated in resinous varnish and then dried. When written on with a solu-

tion of caustic soda the coating and paper base erode, and when the coating is washed away along the written lines, the paper becomes porous, permitting the ink of the copying press to pass through to reproduce the writing on underlying paper. Subsequently Edison's patent for an electric pen which pierced the prepared paper to permit ink to be applied to the writing was followed by the cyclostyle stencil in which a sheet of paper was placed upon a zinc plate and written on with a rotatable stylus having peripheral teeth, which perforated the sheet, and from which copies were made by applying ink thereto.

Next came a file plate for mimeograph copying (Zuccato's trypograph) in which tiny teeth penetrated the paper pressed down upon it by hand. In these stencils, which were mainly used for writing addresses, the paper was closely woven, and the coating on one side of the paper was hard, in order to keep impervious those parts not perforated or penetrated. Zuccato, who was a prolific inventor in the art, quickly adapted stencils to typewritten matter by putting above the type surfaces small, penetrating, pinlike projections, which made holes through which the ink was forced to reproduce the typed letters, and in another patent wound wires around the roller of the typewriter to make a rough surface upon which the sheet was placed for perforation when struck by the type. Patents No. 10,869, of 1891, and No. 16,056, of 1892. At a later time a close-fibered stencil paper with hard wax coating perforated by sandpaper or bolting cloth, upon which typing impressions were made by contacting the filmy paper, was used.

In the year 1887 an important discovery was made by John Brodrick, namely, the adaptability of Japanese Yoshino paper as a base for stencil sheets. Patent No. 377,706. Closely woven impervious paper treated with hardened wax was discarded, and an open weave paper, porous and veil-like, took its place. No sizing was added, simply a coating of soft wax to close the inherent interstices, plainly seen through a microscope, so that when the type struck the paper, the wax left the fibers at the point of contact without severing them. Brodrick's invention became involved in considerable litigation, and various federal courts had occasion to examine his achievement in connection with the prior state of the art. Judge Townsend, in A. B. Dick v. Henry (C. C.) 75 Fed. 388, concurring with Judge Green (A. B. Dick Co. v. Fuerth [C. C.] 57 Fed. 834), and with Judge Wheeler (A. B. Dick Co. v. Wichelman [C. C.] 74 Fed. 799, affirmed, 88 Fed. 264, 31 C. C. A. 530), substantially said that Brodrick's conception of the use of Yoshino paper made it unnecessary to cut or perforate the paper, and that the process was an expressing or extracting process as distinguished from a perforating or cutting process. Coating with soft wax a paper having holes in it was regarded by the learned court as materially different from prior processes wherein the paper was first coated and then holes cut in it by perforation or piercing.

The Brodrick claims were broadly construed to include any stencil sheet having for its base Yoshino paper or Japanese dental paper coated with a substance impervious to ink. That Brodrick made an important advance in the art is herein conceded on both sides. Indeed defendant admits that such stencil paper was the only stencil paper

that could be used successfully in typewriting machines. Brodrick's first patent expired in 1905, and his second in 1912. There were, however, certain objections to his stencil which the skilled in the art tried at various times to overcome. The number of copies that could be produced was limited, the stencil was very brittle and easily injured by changes in temperature, and the copies were often blurred.

The Dermatype stencil, as complainant's stencil is known, is claimed to be the first stencil practically indestructible either by variations of temperature or by handling, and may be filed away for an extended period and reused for duplicating a large number of copies in good condition. The preferred solution for the production of the stencil sheets comprises gelatin, white sugar, glacial acetic acid, glycerin, water, and potassium dichromate. After the coating has been applied the sheet is dried and exposed to daylight to make it nonplastic and insoluble in water. Complainant's claim is that its stencil sheet is normally dry, but hygroscopic and limited by the disclaimer filed herein to the extracting or expressing process, meaning thereby, as heretofore pointed out, that the film on the stencil is expressed or discharged by the stroke of the type without destroying the fibers; that the sheet for the first time is impregnated with a coagulated colloid or gelatin, rendering it impervious to ink until impressed by the type, when the fibers open for the ink to pass through, together with a tempering element for softening the colloid, and then moistened before being typed. Such method of impregnating the sheet was new and novel and of immediate value, as the vast number of sales of the product proves.

[1-4] All the claims in controversy relate generally to a stencil sheet of Yoshino paper impregnated as specified, and differ only as to their scope. Claims 2 and 22 of patent No. 1,101,268 and claims 2 and 4 of patent No. 1,101,269 alone will be set forth.

"2. A stencil blank capable of being stencilized, consisting of a dry but hygroscopic sheet of fibrous material impregnated with a coagulated colloidal substance and a tempering agent, substantially as described."

"22. A stencil blank capable of being stencilized by pressure, comprising a sheet of fibrous material impregnated with a compound consisting of protein one part, sugar one part, glacial acetic acid one part, glycerin two parts, and potassium dichromate sufficient to coagulate the compound when exposed to light, substantially as described."

"2. The process of forming a stencil sheet which consists in impregnating a sheet of fibrous material with a colloidal substance, rendering said substance normally nonplastic but capable of being temporarily softened, by treating the same with a coagulant and a tempering agent and drying the sheet so impregnated, substantially as described."

"4. The process of forming a stencil sheet which consists in impregnating a sheet of fibrous material with a colloidal substance, rendering said substance normally nonplastic but capable of being temporarily softened, by treating the same with a chromic coagulant and a tempering agent and drying the sheet so impregnated, substantially as described."

The defense is anticipation by the British patent No. 13,851, granted to Zuccato in 1893. Comparison of this patent with the prior basic patent to Brodrick and the patents in suit in connection with the evidence satisfies me that there are essential differences between them; Zuccato referring specifically to the perforating process, while Fuller's patents are limited to the expressing process. It is true there are

terms in Zuccato's specification from which it might be surmised that he intended to include Yoshino paper as a base for his coating, but his emphasis on tissue paper free from pin holes, preferably possessing a long fiber, and his reference to a medium ream weighing between four and six pounds, for coating on one or both sides, in view of his acquaintance with Yoshino paper and the Brodrick patent, indicates to my mind an exclusion of Yoshino paper in favor of a tissue paper of the closely woven type. The patent law requires certainty of expression, and not merely conjectural allusion or ambiguous reference to the subject-matter, before a prior patent can overcome the validity of a later one that has meritoriously progressed the art. The burden of proving anticipation is on the defendant, and in case of reasonable doubt as to anticipation, the doubt must ordinarily be resolved against it. Cantrell v. Wallick, 117 U. S. 689, 6 Sup. Ct. 970, 29 L. Ed. 1017.

Zuccato's patent, although referring to imperfections in the stencil making art, was not designed to improve the Brodrick process. Zuccato's object was to improve the perforated type of stencil in which a Yoshino base was impracticable. And while he says that perforation of the paper results from the action of the type without cutting or breaking out the characters, he nevertheless did not have in mind the extracting or expressing process. Such wording seems to me to imply that the coating would not be crushed, owing to the use of glycerin in lieu of wax or paraffin, which, as heretofore stated, being brittle, was easily broken. Although Dr. Little believed that the glycerin coating softened the paper and was sufficiently waxlike in character to be pushed aside, he does not mean to be understood, I take it, that the coating was displaced without rupturing the fibers, as is the case with a Yoshino base. The two processes require different bases and different coatings to achieve the best results. The disclaimers in suit, properly filed, I think are unmistakably limited to a Yoshino paper base and to the expressing or extracting process. According to the evidence the compounded coatings were also dissimilar.

The claims in suit refer essentially to a coagulating gelatin—a term signifying a hard and nearly dry coating—and though the alum of Zuccato's mixture hardens the sheet, it fails to permanentize the coating or tan it, as in complainant's patents, and it becomes soft in cold water or dissolves in hot water; while, on the other hand, the coagulation in complainant's patents, resulting from the use of potassium dichromate, or its equivalent substances, such as tannin, tannic acid, and chrome alum, not only hardens the gelatin, but also makes it insoluble and permanent. In addition to being the first to impregnate with a gelatin and alum solution, Zuccato made other important changes. For example, he first dried the paper after coating, then soaked it in glycerin and water to invest it with moisture, and later allowed the water to evaporate, which required soaking the sheet in damp cloth before perforation, indicating an intention to retain a degree of moisture which would make the paper rotten and thus facilitate its perforation. The described treatment did not coagulate the gelatin contents as did Fuller's, although in the latter a certain amount of hygroscopicity was necessary. No stencil sheets made in strict accordance with Zuccato's process were produced by defendant,

and samples in evidence have, in most instances, a Yoshino base, which would seem to strengthen complainant's contention that stencils for the expressing process are not successfully made by the Zuccato method.

Defendant has sold three different kinds of stencil paper, the base in each being Yoshino paper, and the hardening element a coagulant within the terms of the patents in suit. The compounded coating of stencil Exhibit I consisted of gelatin, glycerin, Turkey red oil (or soap oil containing Turkey red oil), and chrome alum; of stencil, Exhibit J, gelatin, glycerin, and chrome alum; while the ingredients of stencil Exhibit K were gelatin, glycerin, and formaldehyde. The combination of chrome alum with gelatin, tempered with glycerin and Turkey red oil, was in its essence the coating of the patents in suit. Though potassium dichromate was not used by the Equilibrator Company in the manufacture of stencil sheets (Exhibits I and J), chrome alum served as a substitute, and was its recognized equivalent as a coagulant of gelatin. In defendant's stencil (Exhibit K), the coagulant was formaldehyde in combination with gelatin, forming the filling material of the Yoshino base, but according to a fair preponderance of the evidence the ingredient formaldehyde was known in the art to be the equivalent of potassium dichromate for coagulating gelatin, while alum, specified by Zuccato as the substance for rendering gelatin insoluble, only hardened it without permanentizing its condition.

Criticism is made upon the multiplication of claims; but, as they all relate to the same subject-matter and are both broad and specific, they were undoubtedly differently phrased to protect the patentee against any possible prior inventions, an expedient that does not invalidate them. Parke & Davis & Co. v. H. K. Mulford Co. (C. C.) 189 Fed. 95, affirmed 196 Fed. 496, 116 C. C. A. 262. In my opinion all of the involved claims of Fuller patent No. 1,101,268 are infringed by the defendant's commercial stencil sheets (Exhibits I and J), and all the involved claims in which formaldehyde (a nonmineral) is shown to have been the coagulant, save claims 23 and 24, which specify a mineral coagulant, are infringed by Exhibit K, also defendant's product. Patent No. 1,101,269 is infringed by defendant's stencil sheets in evidence, all having a Yoshino paper base, and the coating being a protein or gelatin, treated either with a coagulant such as dichromate or chrome alum and formaldehyde, and using glycerin for softening.

[5] Patent No. 1,101,270, relates specifically to printing multiple copies, as the patent states, more conveniently, economically, and with better results by the use of the stencil in question. The involved claims are for a particular method of drying the stencil sheet after it has been cut and moistened. This, it is explained, enlarges the opening in the sheet made in forming the letters or figures, and apparently refers to a drying additional to the drying of the coating in making the stencil; that is, a drying just before the stencil is typed; and, in my view, the evidence does not sufficiently show that the defendant company in making duplicate copies subjected the sheets to any such method of drying before use in the typewriter. But aside from this, the claims are simply for using the stencil sheets and moistening them in one way or another when they have become dry

from disuse, and the described method for drying them does not, in my opinion, involve invention in view of the fact that another patent in issue herein includes the method for making the stencil.

The Fuller patent for the article and the Fuller patent for the process involved herein are held valid and infringed, while the patent for duplicating copies is held not infringed by defendant. Decree accordingly, with two-thirds costs to complainant.