## A. B. DICK CO. v. BARNETT.

(District Court, S. D. New York. September 27, 1922.)

No. 20–366.

1. Patents ⟨⟩328—1,101,268, claims 1, 2, 6–16, 19, 20, and 23–27, for a stencil sheet, held operative and infringed.

The Fuller patent, No. 1,101,268, claims 1, 2, 6–16, 19, 20, and 23–27, for a stencil sheet, in which dichromate of potash is used to produce coagulation, *held* operative, though the formula was modified in commercial practice, and infringed by defendant's formula, which contained chromium, to produce some, but not full, coagulation.

2. Patents ⟨⟩118—Chemist is person "skilled in the art" of stencil making.

In the art of manufacturing stencils the term "person skilled in the art" is not to be limited to merely uneducated artisans, but means a skilled chemist, so that the disclosure was sufficient if it enabled a chemist to make the stencil, though others were unable to do so.

[Ed. Note.—For other definitions, see Words and Phrases, Skilled in the Art.]

In Equity. Suit by the A. B. Dick Company against Louis A. Barnett for infringement of a patent. Decree rendered for plaintiff.

Suit for infringement of claims 1, 2, 6 to 16, 19, 20, and 23 to 27 of United States letters patent No. 1,101,268, granted June 23, 1914, to plaintiff, as assignee of Louis E. Fuller, for stencil sheet.

Samuel Owen Edmonds, of New York City (J. Edgar Bull, of New York City, of counsel), for plaintiff.

E. Clarkson Seward, of New York City, for defendant.

MAYER, Circuit Judge. The patent was held valid in Dick Co. v. Underwood Typewriter Co. (D. C.) 246 Fed. 309, affirmed without opinion 252 Fed. 990, 164 C. C. A. 663. Therefore the Underwood Case, supra, must be accepted as far as it goes, and there is nothing in the present record which menaces validity, if the patent disclosure is operative. While some other points were urged, the pres-

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ent controversy may be reduced to two defenses, inoperativeness and noninfringement.

The present commercial stencil sheet has attained large commercial success, but that fact does not aid in determining the question of inoperativeness. The commercial stencil sheet is manufactured under a formula quite different in some respects from the preferred formula of the patent and from the formulæ otherwise suggested by the patent. The formula of the commercial stencil is, of course, operative; but when there is a substantial practical difference, although there may be no patentable difference, between the formula used to manufacture the commercial article and the preferred or best formula which the patentee put forward in his specification, then commercial success must be viewed cautiously, and perhaps laid aside as an aid to resolving doubt as to invention.

[1] 1. Operativeness. The stencil duplicating art developed chronologically as follows: (1) Chemical processes; (2) perforating processes; and (3) extracting processes. Under the last kind of process Brodrick's invention granted February 7, 1888 (United States letters patent No. 377,706), took control and dominated the art for about 25 years until the present commercial stencil paper of plaintiff, known as Dermatype, was put on the market in 1912. The outstanding defects of the Brodrick sheet seem to have been (1) its delicacy and fragility; (2) its sensitiveness to changes of temperature; (3) its inability to produce a large number of copies; and (4) its failure to be suitable for filing and re-use.

There is no doubt that Dermatype, and for that matter apparently Hesco (defendant's article) have met these defects. The testimony of the witnesses, accompanied with demonstrations in the courtroom, shows beyond dispute the very valuable commercial virtues of "Dermatype."

What, then, accomplished this advance? The principal feature of Fuller's invention is the use of potassium dichromate, so as to attain an impregnating solution of chromatized gelatin which is softened by glycerin. Of course, it was necessary to select the proper base, and this Fuller stated should be "sheets of an open lacelike material, such as Japanese Yoshino paper."

Having arrived at these two major conclusions, the rest of the problem consisted in working out more or less obvious ingredients and the proportions of the mixture. Fuller stated:

"The solution which I have found to be the best and most useful is as follows: A colloidal substance, such as gelatin, one part, white sugar one part, placial acetic acid pure one part, glycerin two parts, water two parts, all by weight; potassium dichromate in crystals enough to color the compound a deep yellow. The gelatin should first be broken into pieces of a convenient size and dissolved in the acetic acid and water, a gentle heat, such as a water bath, being applied, if it is desirable to effect solution in a shorter period of time. The sugar and glycerin are then added and the whole thoroughly mixed, so that the ingredients are completely blended and dissolved. The potassium dichromate, preferably powdered crystals, is then added to the extent of as much as the solution will dissolve, or at least enough to color the compound a deep yellow. The whole is then filtered by suitable means. I then take sheets of an open lacelike material, such as Japanese Yoshino paper, for example, lay them on a smooth nonabsorptive surface, as

a plate of glass, and with a brush flow thereover the said material with the said solution, a dim light being desirable in this coating operation as in the operation of preparing the coating compound. The sheet is then suspended to dry, and, when dry, is exposed to daylight or other suitable light. Within a shorter or longer time, dependent upon the intensity of the light, the sheet will change in color to a grayish green or lavender; such change being due to the reduction of potassium dichromate to chrome alum and coagulation of the gelatin. By such exposure and reduction the compound is rendered nonplastic and made insoluble in water, hot or cold, except that it will soften slightly under the influence of moisture and is hygroscopic. It is also rendered proof against all neutral solvents and against concentrated alkaline and dilute acid solutions. It is also proof against oils and greases and all solvents of the same, this latter property being one, however, possessed by a simple compound of glycerin and gelatin alone upon gelatinization.

"Should the glycerin and sugar be omitted from the solution herein described, the sheet of stencil material would be completely waterproof, and it would be impossible to render the sheet soft enough by application of moisture to afford proper stencilization by means of pressure applied. In any case, by such omission of glycerin and sugar, the sheet would be too hard and brittle to afford good results. The sugar and glycerin, or one of them, are therefore necessary to properly temper the composition. I have found that, by adding the glycerin and sugar in greater or less quantities, the degree to which the stencil sheet will soften under the influence of moisture may be largely varied, so that I use a certain proportion of glycerin as hereinbefore set forth for producing a stencil sheet of desirable properties for the purposes described. Were the sugar omitted from my compound, it would be necessary to use a greater proportion of glycerin, with the result that the stencil sheet would be hygroscopic for most climates; still the sheet thus made would be useful and durable, and would possess approximately the same properties and characteristics as when the sugar is used. I have found that, if insufficient potassium dichromate is used, the stencil sheet will not be workable to a practical degree, on account of insufficient coagulation of the gelatin, so that it is desirable to dissolve in the compound all of the potassium dichromate that the solution will take up."

What Fuller claimed is sufficiently illustrated by claim 1, which reads:

"A stencil blank capable of being stencilized, consisting of a dry, but hygroscopic, sheet of fibrous material impregnated with a coagulated colloidal substance, substantially as described."

Of course, in a specification which deals with proportions as well as ingredients, it is often easy to attain scientific accuracy after invention, and the court may readily lose its way, if it pauses too long and too much over mere detail, such as whether or not "it is desirable to dissolve in the compound all of the potassium dichromate that the solution will take up." It must always be remembered that this inventor points the way, and that is particularly difficult in a chemical case, because of the elusive nature of the English language and the action of ingredients, usually far from perfect in the early stages of any invention.

Because equipped chemists are necessarily skilled men, they often can improve the original formula so advantageously that the last word on the subject may well do injustice to the merit of the first effective step by making it seem feeble in retrospect. Thus is emphasized the ever-recurrent necessity of reading the patent with contemporaneous eyes.

Fuller told the art all the ingredients. Obviously, for instance, it would have been foolish to attempt to describe a particular kind of glue or gelatin. There are many kinds of glue and gelatin on the market. To have specified a particular brand would have deprived the patent of reasonable elasticity and opened the door to infringers. It is enough if Fuller informed the man skilled in the art to do the thing.

Who, then, in this case, is the man skilled in the art? It seems to me that the facts answer the question. Defendant called five witnesses, who testified that they tried to produce the stencil of the patent, but failed, because of the insufficiency of the Fuller specification. Fuerth and Grening, two of these witnesses, testified in the Underwood Case. Although Judge Hazel's opinion did not discuss operativeness, it must be assumed, because of the decree made by him, that the testimony of these two witnesses did not impress him. It is no reflection on their integrity to state that this court has arrived at the same conclusion. Although intelligent business men, they had not the equipment necessary to characterize them as men skilled in the art.

A third witness, Heyer, was an amusing person, who was naïvely ignorant. Strippel and Novotny were men of considerable skill, and I believe genuinely tried to get the result. Strippel was interested. It can hardly be said that Novotny was, except in rather a remote sense. Nevertheless a man may be truthful and sincere, though interested.

Strippel recognized that the "whole secret * * * is the dichromate of potash, the weight of the dichromate of potash to the weight of the gelatin used. * * *" In the first test he used 10 per cent. of dichromate, but found the solution was "too thick." Novotny testified that no proportion from one-half of 1 per cent. to 25 per cent. would do. No stencil sheets were produced by Strippel and obviously none by Novotny. All such testimony is far from convincing when it is realized that an error, for instance, in light or heat conditions, may lead to failure.

Orr, for plaintiff, testified that he succeeded; but, as he was an interested witness, he may have taken a degree of care which a layman of equal qualifications may not have employed. But Dr. Grosvenor, plaintiff's expert, had no difficulty, while Dr. Pond, defendant's expert, was not interrogated as to sufficiency—a very significant omission.

It is true that both these chemists were paid experts, but they are both men of high character and attainment, and one needs but see and hear them to realize that a retainer would not affect their mental integrity, nor the good faith of their testimony. Indeed, they were agreeably frank in a number of instances, where more sophisticated experts might have tried to evade answers which seemed to favor the opposite side.

I am inclined to think that the Turkey red oil used in plaintiff's commercial stencil as a tempering agent has had much to do with the excellent character and durability of plaintiff's commercial article;

but, under the specification, Fuller had the right to use this agent whose action, according to Grosvenor, is "similar to that of the glycerin and sugar, and helps to keep the stencil for a longer period soft and in good condition for remoistening—increases the life of the commercial article."

The ingredients of the patent solution and the Dermatype are as follows:

| 1 | 2 | 3 |
|---|---|---|
| | Patent Solution. | Dermatype Solution. |
| Filler ............... | Gelatin. | Gelatin. |
| Solvent of filler..... | Water. | Water. |
| Coagulant ........... | Potassium dichromate. | Potassium dichromate. |
| Coagulation retardent | Acetic acid or alcohol. | Acetic acid and alcohol. |
| Tempering agents ... | Glycerin and sugar. | Glycerine, sugar, and Turkey red oil. |

The two formulæ (Fuller's preferred and Dermatype), showing proportions with the pound taken as unit, are as follows:

| Patent. | Commercial. |
|---|---|
| Gelatine, 1 pound. | Gelatin, 26 pounds 8 ounces. |
| White sugar, 1 pound. | Sugar, 12 pounds 8 ounces. |
| Glacial acetic acid, 1 pound. | Acetic acid, 2 pounds 10 ounces. |
| Glycerine, 2 pounds. | Glycerine, 78 pounds 15 ounces. |
| Water, 2 pounds. | Cold water, 78 pounds 15 ounces. |
| | Denatured alcohol, 132 pounds. |
| | Turkey red oil, 18 pounds. |
| | Mixture of blue analine base, alcohol, and acetic acid, 2 pounds 14.5 ounces. |
| Dry potassium dichromate enough to color the compound a deep yellow, or, preferably, as much as the solution will dissolve. | Mixture of water and dichromate of potash in the proportion of about 8 to 1, approximately 19 pounds 2.3 ounces, which equals approximately 2 pounds 6.3 ounces of dry dichromate. |

Returning to the inquiry, the question is whether, if columns 1, supra, are followed, an operative stencil sheet can be produced. This having been answered in the affirmative by Grosvenor's testimony, the specification was clear enough to a chemist. The efforts of Strippel and Novotny, taken at face value, when compared with those of Grosvenor, demonstrate that what was difficult for them was comparatively easy for him. Strippel and Grosvenor practically agreed as to the per cent. of dichromate, and Grosvenor's superior knowledge enabled him to get the result of the patent.

[2] In this situation, the man "skilled in the art" means a chemist, when slight errors as to light, heat, and other details may make a difference. The phrase is always relative. Some patents are addressed to mechanical problems of a minor order. It may well be that the man skilled in the art in such instances may be even a journeyman. But this stencil art really concerns itself with large production, running into thousands and hundreds of thousands of sheets,

and in such an art, where chemical ingredients or units are employed, it would be quite deterrent of inventive enterprise if it were held that the chemist was too high in the scale, and that if one below that equipment were to fail, then the patent which the chemist found operative must be held to be inoperative, because the court has reached down far enough to find that one not a chemist is the "man skilled in the art."

It is held, therefore, that the patent is valid in all respects.

2. The question of infringement falls' within a narrow compass. It turns solely on a matter of degree. Hesco attains substantially the same result as the product of the patent in suit. The Yoshino base is the same. Defendant's solution contains chromium, but there is less dichromate than in Fuller's preferred formula. There is not full coagulation, in the sense that every gelatin sol is combined with or tied up to a chromium particle.

At this point it is well to state that whether the particles combine chemically or (so to speak) are connected physico-chemically is immaterial. In other cases, as well as this, it has come to the attention of the court that it is difficult and sometimes impossible for even the ablest chemist to determine or agree as to whether a particular combination is truly chemical or mechanical.

While the formula of Hesco was not disclosed, it is proved beyond question that defendant's solution contains chromium. Under Fuller's preferred formula substantially every gelatin sol is insoluble. In the Hesco product, apparently considerably less than every such sol is insoluble, but nevertheless there is some insolubility. It is unnecessary to describe the different tests, because in the last analysis they merely demonstrate greater or less insolubility or solubility, as the case may be.

With the foregoing hypothesis, the question is whether the claims in issue must be construed as meaning full coagulation. No such requirement is found in the language of the claims in issue. Fuller or his solicitors doubtless realized the necessity of careful language provoked by a patent of this character, and in some of the claims, not here in issue, such as claim 3, the expression "fully coagulated" is used. Thus, as matter of formal language, the claims in issue are satisfied if there is coagulation.

Looking behind the language to the substantial merit of the invention, the next question is whether the claims in issue must be construed as meaning "fully" coagulated. In this connection, defendant earnestly argues that plaintiff succeeded in the Underwood Case only because his counsel urged a narrow and restricted scope for the claims, and that they were driven to this position by the disclosures of the prior art, particularly Zuccato. As I read Judge Hazel's opinion, there is nothing to justify the conclusion that he held the claims within such narrow limits. Clients are represented in succeeding litigations upon the same patent sometimes by the same attorneys, sometimes by different attorneys. It is quite interesting to note that frequently the understanding both of the courts and of the lawyers in respect of the position of an invention grows clearer with the extend-

ing experience which successive litigations develop. It would indeed be unfortunate if the client was bound by his lawyer's arguments. Rights are determined, not by what the lawyer argues, but by what the court decides. The result sometimes is that, in a second or later litigation, claims are more narrowly or broadly construed, as the case may be, than in the first litigation. In the case at bar, the essential feature is that some coagulation is accomplished because of the use of dichromate, which was not theretofore used in the art, and "some" coagulation accomplishes the result.

The case is one which exemplifies the time-worn proposition that the prior art is still open to defendant, and that defendant may treat his gelatin with ordinary potash alum, as in Zuccato, but that, when he treats it with chromium, he is employing the vital agency which in the greatest measure is responsible for attributing invention to Fuller. This invention is of sufficient merit to bring it within the principle of General Electric Co. v. Alexander (D. C.) 277 Fed. 293, affirmed (C. C. A.) 280 Fed. 852, when the court was called upon to construe the word "coherent" in connection with its context.

As usually occurs in chemical cases, there is a great mass of detail, but it is sufficient for the purposes of this opinion to set forth the main reasons which have led to the conclusion that the patent is valid, and that the claims in issue are infringed.

NOTE.—The decree may be submitted on five days' notice. Contemporaneously the court will entertain an application for a suspension of the injunction upon proper terms.