*100 OPINION.
Seawell:
The parties are in agreement that the primary issue here presented for determination is the March 1, 1913, value of certain patent applications which were held by the petitioner on March 1, 1913. The history of the applications in question from the time they were filed in the Patent Office in 1909 until they ripened into patents in 1919 and 1920, and the manner in which the issue here involved arises, are set forth in much detail in our findings and will not be repeated except in a brief summary. In short, what occurred was that the petitioner, an inventor, had been engaged prior to 1909 in making certain inventions relating to oil-refining processes and in December, 1909, filed two applications for patents in the Patent Office on inventions alleged to have been perfected by him with respect to what is referred to in the art as “ cracking oil.” The first application was filed on December 1, 1909, and the second on December 31, 1909, and patents thereon were issued on October 28, 1919, and January 6, 1920, respectively. The former is referred to as an “ apparatus ” patent and the latter as a “ process ” patent. Prior to the issuance of the foregoing patents, namely, on February 27, 1919, petitioner entered into an agreement with the Texas Company under which he sold and assigned his rights under the applica *101 tions in question. Pursuant to the foregoing agreement and certain supplements thereto, the petitioner received lump-sum or down payments in 1919 and 1920 of $95,000 and $35,000, respectively, and a salary of $1,000 per month from the date of the original agreement in 1919 to December 31, 1924. In addition to the foregoing payments, petitioner also received annual payments under the contract or contracts varying from approximately $8,000 in 1920 to $400,000 in 1925. The years involving the lump-sum payments are not before us and there is no question raised as to the salary payments. What the petitioner contends is that the annual payments received were a return of capital and therefore would not constitute taxable income to him until a fair market value of the patent applications of $25,000,000 on March 1,1913, is returned to him or, in the alternative, that a deduction should be allowed in each of the years during the term of the contract of one-seventeenth of the fair market value of the said applications -on March 1, 1913. On the other hand, the Commissioner included the entire amount of annual payments in gross income for each of the years involved and allowed no deductions therefrom, on the ground that the patent applications had no fair market value on March 1, 1913. In other words, the first and basic point on which the parties differ is as to the fair market value on March 1, 1913, of the patent applications in question, since unless it is found that the applications were of value on March 1, 1913, the parties are agreed that the annual payments received shall be included in gross income without any deductions therefrom on account of prior ownership by petitioner of the applications.
That there is a real difference between the parties on the foregoing question is shown by the petitioner’s allegation that the applications had a fair market value on March 1, 1913, of at least $25,000,000, whereas the Commissioner contends that such applications had no fair market value on that date. The Commissioner at first urged that as a matter of law patent applications, irrespective of their character, have no fair market value and therefore it is unnecessary to consider evidence with respect to the value of the applications here in question, though in his brief he concedes that the Board has taken the opposite view on many occasions (Hershey Manufacturing Co., 14 B. T. A. 867, and cases therein cited (affd., Hershey Manufacturing Co. v. Commissioner, 43 Fed. (2d) 298)). However, without receding from the foregoing position, he now urges that in any event the patent applications with which we are here concerned had no fair market value on March 1, 1913. We do not consider it necessary to discuss our reasons for the conclusion that there is a property right attaching to a patent application which may be of value; our reasons are fully set forth in the case referred to above, and it will suffice here to affirm our previous position. What that value *102 may be under given circumstances and with respect to a given patent application is a question of fact and presents the real issue in this case.
In support of their respective positions, a voluminous record has been prepared, consisting of more than 1,500 pages of transcript, in addition to lengthy exhibits in the form of carefully compiled data and graphs, reports of hearings and decisions in related proceedings, treatises on the art of “ cracking oil ” and much other information. Expert witnesses of the highest order, some of them not only skilled in the art with which we are concerned, but also versed in a knowledge of patent law, were introduced by both parties. That is, we do not have the situation which often occurs in our proceedings where witnesses are produced only by the petitioner, but both parties were well fortified with experts who shared their respective views as to value. And it might be added further that the views of the experts were, without exception, in accordance with the allegations of the respective parties, the Commissioner’s witnesses insisting that no fair market value existed at March 1, 1913, whereas the petitioner’s chief witness, around whom his case as to value is built, testified that after allowing for all possible contingencies the fair market value at March 1,1913, was even in excess of $25,000,000. With these sharply conflicting and widely divergent views, we are faced with the situation such as faces a jury in a trial court where our duty is to consider all of the evidence and seek to form our conclusion as to the fair market value of the applications in question on March 1, 1913. And in making our determination we must keep in mind the well established principle that such a value must be based only upon the facts in existence or in reasonable contemplation on March 1, 1913, as shown by the evidence. :
On a consideration of the entire record, we are convinced that the petitioner is far too optimistic with respect to the situation as it existed on March 1, 1913, and as to the manner in which we believe parties would have dealt with respect to the purchase or sale of the applications in question on that date. At that time the patents had not issued and the applications themselves were in a state of rejection in the Patent Office. While rejections such as had here occurred are not to be considered final and a skilled patent attorney' might' well have been able to have foreseen the ultimate outcome with a reasonable degree of certainty, we certainly have in this situation an unfavorable factor existing at March 1, 1913, even when looked at in the most favorable light for the petitioner. How common it is for patent applications to be beset with the difficulties which attended these applications in their course through the Patent Office we do not know, and well may it be that these applications were “ diamonds in the rough ” awaiting discovery by and the touch of skilled hands *103 which would bring them to light and guide them to their fruition in the form of patents, but, to say the least, we regard it as of some significance that a period of ten years elapsed from the time the applications were filed until the patents finally issued and that during that period almost every type of difficulty was encountered. Much of this occurred prior to March 1, 1913, as shown from our findings, and that which transpired after March 1, 1913, merely emphasizes that whatever the petitioner had on March 1, 1913, was subject to many infirmities which had to be corrected before the patents finally issued. We do not think a valuation of such applications can be made without taking the foregoing condition into consideration as an unfavorable factor. In marked contrast, we find that the Burton application (referred to in our findings) was filed in July, 1912, and the patent was issued in January, 1913. Even though we think it clearly established that the specifications of a patent are addressed to those skilled in the art, we do think that imperfect specifications, even though possible of correction by one skilled in the art, are to be weighed against a patent application in placing a value thereon.
On the other hand, we are of the opinion that we must accept the patents as valid and as properly issued on the original applications. In other words, collateral attack may not be made in this proceeding upon the action of the Patent Office in the issuance of the patents and, since such an attack may not be countenanced, we must consider that the applications which were filed in 1909 and were in existence on March 1,1913, properly disclosed the inventions which were protected by the patents as issued in 1919 and 1920. While the foregoing conclusion may be at variance with the recent decision of the United States District Court for the District of New Jersey in the case of Texas Co. v. Warner Quinlan Co., decided January 8, 1931, wherein the court held that the petitioner, “ through extensive manipulation and alteration of specifications and claims, came out of the Patent Office with something entirely different from that which he took there in the original instance,” we know nothing of the facts upon which this conclusion is based and the opinion-sets out the conclusion of the court with very meager reasons therefor. Further, the foregoing decision is at variance with the report of the special master referred to in our findings and which was approved by the District Court having jurisdiction thereof. (United States v. Standard Oil Co. of Indiana et al., supra.) In view of the foregoing, we shall proceed on the theory that the patents were valid when issued and that the inventions as disclosed therein were properly disclosed in the original applications. Cf. also Standard Oil Co. of Indiana et al. v. United States, referred to in our findings *104 as decided by the Supreme Court on April 13, 1931, which accepted the patents as presumptively valid on the basis of the action of the District Court.
When viewed in that light, we find that the petitioner had on March 1, 1913, patent applications for cracking oil which antedated those on any process which has been perfected, except an application by one Dubbs, but, because of differences in the character of process there involved, Ave do not think the Dubbs application materially affects the value with which we are concerned. The petitioner’s applications contained seven basic features, one or more of which are embodied in every successful commercial process which has since been placed in operation.. The Holmes-Manley process, now owned and operated by the Texas Company and almost universally recognized as the highest embodiment of the art of bulk pressure distillation, makes use of the seven features disclosed and contributed by the petitioner’s patents. The Burton process which was perfected and placed in successful operation prior to March 1, 1913, makes use of two of the aforementioned features of petitioner’s patents. The foregoing process demonstrated the practicability of a cracking process on a large commercial scale. It also demonstrated what had theretofore been considered impossible and what had been carefully avoided by men in the oil industry, namely, the use of pressure in an oil-cracking process. Prior to that time pressure in its relation to cracking oil was well known, but it was very much feared because of the dangers attending its use. The two features in the petitioner’s process which are common to the Burton process are those having to do with the use of pressure.
In the next place, we think it fairly established and we have found as a fact that there was a shortage of gasoline on March 1, 1913, both present and reasonably to be anticipated, and that the oil industry then realized that the demands for gasoline could not be met from the crude-oil production then reasonably to be expected unless some better method could be devised to secure a higher percentage of gasoline from crude oil. At that time the automobile industry was well established. The status of that industry on March 1, 1913, and our conclusions as to its reasonably certain favorable future prospects are set forth by us in the case of James Couzens, 11 B. T. A. 1040, and need not be here repeated other than to state that the data here furnished amply confirms what we said in the Gouzens case where, in discussing the automobile industry, we said that “ it had passed the incipient stage and in 1913 its only uncertainty was the breadth of its future expansion.” Since the auto'mobile was the most important factor in the increased demand for gasoline, it is worthy of notice that the consumption of gasoline *105 increased from 11,260,000 barrels in 1909 to 29,915,000 barrels in 1914 (no figures being available for 1912 and 1913) and that the registration of motor cars increased from 312,000 cars in 1909 to 1,'700,000 cars in 1914. During that time the producers of crude oil were aware of the rapidly increasing demand for gasoline and in 1911 and 1912 leaders in the oil industry were actively at work in an effort to meet the expected shortage. As the Supreme Court said in Standard Oil Co. of Indiana et al. v. United States, supra, “ For about half a century before 1910, gasoline had been manufactured from crude oil exclusively by distillation and condensation at atmospheric pressure. When the demand for gasoline grew rapidly with the widespread use of the automobile, methods for increasing the yield of gasoline from the available crude oil were sought.” The experimental work along that line which is referred to in the record had to do largely with efforts to develop cracking processes, though we do not understand that the activity was confined to those lines either in the development of new processes or in efforts to increase production or to conserve that which was being produced. We do think that with an existing and prospective shortage of gasoline the development of a successful commercial process which would permit of a great increase in the recovery of the gasoline content of crude oil and the conservation of a corresponding amount of crude oil was something of undoubted value. Some idea of what the various cracking processes have meant to the oil industry since the Burton process was put in operation in 1913 to and including 1929 is shown by a production of 707,121,000 barrels of cracked gasoline. It further appears that from 1913 to 1927, inclusive, the production of cracked gasoline by the Burton and Holmes-Manley processes alone amounted to 263,414,015 barrels and resulted in a conservation of approximately 1,162,304,000 barrels of crude oil.
Manifestly, if the demand for, and production of, cracked gasoline could have been accurately forecast on March 1, 1913, and if on the same date a person had had the right under a patent or patents under which he could have produced the additional gasoline needed to the exclusion of all other persons, it is easy.to see that such a property right would have been of great value. In substance, such is the contention of the petitioner, namely, that it could have been reasonably foreseen on March 1,1913, that approximately 800,000,000 barrels of gasoline would be supplied by a cracking process or cracking processes during the next 17 years and that the dominating or controlling factor in such production lay in the petitioner’s patent applications here in question. At that time the Burton process was in commercial operation and the owner thereof had, in 1913, *106 granted licenses for operation under the patents covering that process. These licenses were granted upon the basis of the payment to the owner of 25 per cent of the net profits of the operating company, which was later found to be approximately 50 cents per barrel. On the basis of a production of 800,000,000 barrels this would show royalties to the party or parties controlling the patent situation of $400,000,000. The petitioner’s witness, on the basis of the interchange of license agreements between the Texas Company, which held the Adams patents, and the Standard Oil Company of Indiana, which held the Burton patents, when their respective claims came in conflict, allocates one-half of these royalties to the Adams patents and one-half to the Burton patents, and then, to take care of all possible contingencies, further reduces the amount each would receive by one-half, thus seeking to show that the petitioner was in the possession of property on March 1, 1913, from which he could reasonably have expected to have received during the following 17 years at least $100,000,000. The foregoing amount of $100,000,000, when reduced to a present worth basis at March 1, 1913, makes a value in excess'of the $25,000,000 claimed by the petitioner as the March 1, 1913, value of the applications here in question.
In the first place, we are unwilling to say that there was such a reasonable expectation on March 1,1913, of a shortage of 800,000,000 barrels of gasoline to be met over the following 17 years through the use of a cracking process or cracking processes that patents on a cracking process would have been dealt with on that basis. By this we do not mean to reflect on the ability or integrity of Mr. Westcott, who gave his opinion to that effect. "We are convinced that he is a man of the highest attainments as an analyst in the oil industry, to which he has devoted his attention for the past 13 years. However, the opinion as given was not that of a man who was familiar with the situation in the oil industry on March 1, 1913, but rather of one who would now say what he insists could have been said on March 1, 1913, on the basis of facts then known. Of course, such testimony may be competent, but its weight will depend on a multitude of factors which are present to a greater or less extent in evidence of this character. In brief, it may be said that one would be little short of a prophet and endowed with supernatural powers to be able to say in 1930 that if he had scanned the oil horizon on March 1, 1913, he could have foreseen not only the increased demand for gasoline, but also the manner in which this increased demand would be met. Particularly is this true in the oil industry, which is referred to in the book of this witness as the least understood of all industries and where data even as to the available supply on a given date is necessarily only an estimate. Further, even if we knew the available supply and if we could foresee the future de *107 mand with fair accuracy, we would still have the problem of saying that this demand would be met through the cracking processes of the character here involved. Some of the necessary uncertainties are met through a discounting of whatever is determined by the formula which is applied to the known facts on March 1, 1913, though we are yet left with the fact that we are necessarily in the realm of speculation and conjecture to some extent under any circumstances. Even after the perfection of the Burton process only 17 per cent of the gasoline content of crude oil was being recovered in 1914 and with all the improvements which had been made by 1924 only 30 to 35 per cent was being recovered by the same process and by the Holmes-Manley process at the same time only about 40 per cent. With only about one-sixth of the gasoline content being recovered at or about March 1, 1913, and recognizing the inventive genius of man — particularly when spurred on by necessity — a heavy discount of any shortage to be met by cracking processes in operation on March 1, 1913, must be made to take care of the possibility and even the probability of the perfection of a process which would make other processes obsolete. But by the foregoing we do not mean that the testimony of this witness is to be disregarded; on the contrary, we are satisfied it contains much of value. On the basis thereof, we are convinced that a substantial shortage of gasoline was reasonably to be expected in the years following March 1, 1913, without the use of an improved method for the recovery of gasoline from crude oil, and that it was reasonably to be expected that cracking processes, such as were disclosed by the cracking processes then being perfected, would play a part in meeting the increased demand for gasoline. How much this shortage would be and what particular part the petitioner’s applications might have in meeting such shortage we shall not undertake to determine. We recognize, however, that parties often deal in property, such as we are concerned with here, where unknown and uncertain features are present and that the valuation of such property at a given date is often required, and to that end we have given to this evidence such weight as we consider proper. The petitioner’s principal witness, Wiles, recognized the foregoing siuation when he said, in giving his opinion as to the value in question, that every “ big deal ” in the acquisition of a patent is made on the installment basis, for the reason that “ They will not take three to one gambles and put $1,000,000 on it where the alternative is losing it all. The result is when you get into real figures for patents, really valuable matters, you have got to deal on the installment basis, so it is paid year by year as it becomes good, and if in litigation for what not it is held to be of no value, the payments cease, in other words, you can buy it on *108 the installment plan with some sort of privilege of termination. That is the way every big deal has to be made.”
In the next place, what did the applications contain on March 1, 1913, which made them of value in meeting the shortage of gasoline referred to above? The petitioner says that the value lies in the fact that his “inventions dominate the successful processes practiced today and did so on March 1, 1913,” and that the important, successful processes as now operated could not be carried on except with his permission and upon the payment of royalties to him. We have found as a fact that of the seven important features disclosed by the petitioner’s applications, one or more of these were contained in each of the successful cracking processes which have since been perfected. Whether this means that each of these processes was dominated by that of petitioner we shall not attempt to say, though we have found as a fact that the Burton process was dominated as to two features and the Holmes-Manley process as to seven features by the Adams patents. In view of the importance attaching to the various processes which have been developed and the common features found in all of them, it may seem unusual that patent infringement litigation has not resulted therefrom, though the explanation seems to be that the powerful oil companies elected to compromise their conflicting claims through the exchange of reciprocal licensing agreements rather than resort to expensive litigation. Because of this interchange of license agreements, an action was brought by the Government against the various companies involved on the ground that such action resulted in a violation of the Sherman Anti-Trust Act, which contention was sustained. United States v. Standard Oil Co. of Indiana et al., supra. In that action the court was divided as to the right of the Government to attack the validity of the patents in that proceeding and further found it unnecessary to determine their validity. The court did, however, state that an independent producer “ could hardly engage in the process of refining gas by a cracking process without infringing one or more of. the patented cracking processes.” As shown by our findings, the action of the District Court was recently reversed by the Supreme Court as to the antitrust feature (Standard Oil Co. of Indiana et al. v. United States, supra), and the court found it unnecessary to consider the validity or scope of the cracking patents, though it accepted them as presumptively valid. Further, the evidence is unmistakably to the effect that one of the major considerations which enabled the Texas Company to negotiate favorable reciprocal licensing agreements with the important oil-producing companies was that it was the owner of the patents which were issued on the basis of the applications here in question. This is particularly true in the case of the *109 agreements between the Texas Company and the Standard Oil Company of Indiana. The latter company had a process which was perfected in 1912 and 1913 and had as its first patent protection an application filed in 1912 and a patent issued thereon in 1918. Its process was the only cracking process in successful commercial operation until 1919. On the other hand, the former company’s process was not placed in, commercial operation until 1920 and the petitioner’s patents which are embodied therein were not issued until 1919 and 1920. We think it clear from the evidence that an important consideration in such transaction was the fact that the patents which dominated the process of the Texas Company were prior in point of time to those of the Standard of Indiana. And similar observation may be made with respect to other reciprocal licensing agreements to which the Texas Company was a party. The testimony of the attorney for the Standard of Indiana was that when he first saw the petitioner’s applications in 1916 he was convinced of the conflict between the inventions therein disclosed and those involved in the Burton process, which had a later filing date; that the foregoing opinion was confirmed by him in 1920 when he examined the patents after their issuance and that he then advised the Standard of Indiana that, because of the prior filing dates of the petitioner applications, it would probably lose in a suit with the Texas Company over the conflicting claims; and that while, because of the commercial position which the Standard of Indiana had developed through the successful operation of the Burton process for a period of six or seven years, the Standard of Indiana should have been given a decided advantage in the exchange of licensing agreements, the exchange was made on an even basis largely because of the priority of the filing date of the petitioner’s applications. To a similar effect was the testimony of the attorney for the Texas Company. When we consider that prior to the execution of the cross-licensing agreement the Standard of Indiana had collected more than $15,000,000 in royalties from its licensees under the Burton process, the importance of the even exchange, which carried with it a waiver of any past infringement on the part of the Standard of Indiana to patents owned by the Texas Company, becomes apparent. In other words, we do not think it open to question, under the record as here presented, that the Texas Company secured something of value through the acquisition of the petitioner’s patents. And to reach this conclusion we do not think it necessary to say that the petitioner’s patents dominated the entire oil-cracking industry; we do think that because of the priority of the filing date of the applications and the recognition accorded the inventions disclosed therein the patents issued thereunder occupied an important place in the oil industry.
*110 Our problem, however, is not to determine the value of the petitioner’s patents after they had issued and the process in which they were embodied was perfected, but rather the value of the applications at March 1, 1913, that is, six or seven years earlier. And much that we have said above might be said to be immaterial on the ground that it has to do with events which are too far removed from the basic date in question. We have, however, shown these circumstances in order that we might present more clearly the theory of valuation at March 1, 1913, which has been urged with so much earnestness and at great length by petitioner, namely, that one skilled in this particular art could have looked at the patent applications on March 1, 1913, and have foreseen not only that patents would issue thereon, but also that, in large measure at least, the process developed thereunder would prove an important factor in the oil industry. We think it well established that the disclosures of a patent application- are addressed to those familiar with the art (Lawther v. Hamilton, 124 U. S. 1; Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U. S. 45; A. B. Dick Co. v. Barnett, 287 Fed. 573; and Thomas A. Edison, Inc., v. Waterbury Battery Co., 281 Fed. 254), but we are unwilling to say that an unissued patent on an unproven process can be given the same value, or, under the circumstances of this case, even an amount approaching the same value, as when the patents are finally issued and the process has proven a success. We shall not repeat what we have heretofore said as to the unfavorable situation existing on March 1, 1913, with respect to the issuance of the patents, but even aside from this feature we think that we would be imputing too much to one, however skilled in the art here concerned, to say that he could have foreseen on March 1, 1913, the ultimate outcome of the Adams process to the extent that he would have purchased or would have the company he represented purchase on the basis of a valuation at that time of $25,000,000, even though such payment should be on the installment basis. And in making the foregoing statement we are not overlooking the very positive testimony of petitioner’s chief valuation witness, Wiles, to the contrary, nor the high qualifications of this witness to speak as one skilled in the art. But however skilled in the art he may be, we should hesitate to" give the same weight to testimony of that character that we should to facts which show that the invention disclosed by a given patent or patent application was a demonstrated commercial and practical success on a given date. Admittedly, the market by which we should test the fair market value on March 1, 1913, was reasonably made up of the large oil producers, and they were men skilled in the art. At that time they were apparently unaware of the invention disclosed by the petitioner’s applications, for the reason that such documents are not open for public inspection *111 in the Patent Office and there is no indication that any of the large oil producers became acquainted with their contents prior to 1914. Some importance is attached by the Commissioner to the knowledge and lack of interest on the part of a representative of the Standard of New Jersey as early as 1908 and 1909 in what the petitioner was doing, but the facts show that there was a surplus of gasoline being produced at that time, and the representative merely saw a laboratory demonstration. The representative was of the opinion that Adams was doing little, if anything, more than was being practiced in the oil industry at that time. Without access to the applications themselves and with apparently nothing new being demonstrated, we do not think it of special significance that, when the need for a cracking process became apparent, the Standard of New Jersey did not seek to obtain rights under the petitioner’s applications. The first oil company to become interested in the petitioner’s process was the Texas Company, which entered into an option agreement with petitioner in 1914, but even then it does not appear that the contents of the applications were disclosed to the Texas Company. What happened with respect to the option agreement from 1914 to 1918 is not shown other than that petitioner continued in the employ of the Texas Company at the salary provided under the option agreement. Whether the Texas Company was aware of the importance of the petitioner’s applications and was seeking to develop a process of its own without having to exercise its option, or whether for some other reason it delayed action, we do not know. The first examination by the Texas Company of the application file, as shown from the evidence, was in 1919 and at that time the attorney for the Texas Company advised it of the importance of the disclosures in the petitioner’s applications and at or about that time the contract which gave rise to the income over which this controversy arose was executed. Likewise, as heretofore stated, the attorney for the Standard of Indiana reached a similar conclusion when he first examined the applications in 1916. Both of the aforementioned individuals testified at the hearing as to their conclusions on first seeing the applications and that like conclusions would have been reached by them at March 1, 1913, if the applications had been shown then. We can not, however, overlook the fact that such testimony may well have been influenced by events which have since transpired — the perfection of a highly successful process and the enormous profits which have inured to the holders thereof. The fact that these witnesses saw the dominating character of the petitioner’s applications when they first examined them in 1916 and 1919 may be strongly persuasive of what they or others skilled in the art would have perceived therein at March 1, 1913, but this is not direct evidence *112 of a known and determined value at March 1, 1913. In fact, the inference may well be drawn that the Texas Company delayed action for five years in the exercise of its option to acquire the applications for the reason that it hoped to invent a process which would circumvent their use and thus reduce whatever value attached thereto, and it only seems reasonable that others skilled in the art would have considered such a possibility, on the part of other inventors, in making an acquisition. In any event, it was not until 1919 that the Texas Company saw fit to make their acquisition in order to carry out the process which they were seeking to perfect.
In the next place, to meet the requirement often reiterated by us to the effect that the commercial and practical success of the invention disclosed by a given application must have been demonstrated on a given basic date in order to show a value therefor, the petitioner relies on the fact that on March 1, 1913, the Burton process was a demonstrated success and that two of its features were dominated by the petitioner’s applications. But in whatever light the Burton demonstration may be viewed in its relation to that which was disclosed by the petitioner’s applications, we think it must be recognized that the petitioner, in approaching a prospective purchaser, could not have shown more than that two of his basic features had been demonstrated by another process which was in commercial operation and which was covered by outstanding patents. Under such circumstances it would seem reasonable' to say that such prospective purchaser would have considered that he was purchasing something which almost certainly would require litigation before he could come into complete enjoyment of his full rights. In other words, at best he would not have been purchasing an issued patent on a demonstrated process then in operation, but only an application for a patent (then in a state of rejection) when some of the features therein were then in commercial operation under the assumed protection of issued patents.
On the other hand, the Commissioner contends not only that there had been no successful commercial demonstration at March 1, 1913, but also that the inventions disclosed by the applications were a demonstrated failure on that date. The basis of this claim is the Jacks Bun experiment, which was started in 1911 and 1912 by the petitioner, in conjunction with a syndicate, for the purpose of demonstrating what petitioner had invented. The project was undertaken on the basis of an option agreement under which the syndicate members agreed to pay petitioner a small salary and to supply $12,500 for experimental purposes in return for an option to acquire a half interest in petitioner’s invention when and if they were a demonstrated success. The syndicate members advanced more than *113 was originally agreed upon, and after the expenditure of some $80,000 the project was pronounced a failure and abandoned in July, 1913, the option never being exercised. Its exact status on March 1, 1913, is not shown. Much evidence was introduced by the Government in the form of testimony given by syndicate members in the Government antitrust suit referred to above as to what was demonstrated at Jacks Run — particularly with reference to the use of pressure, which is the principal element claimed to have been demonstrated by the Burton process. On a consideration of the entire testimony, we are not convinced that it constituted such a demonstration as either the petitioner or a prospective purchaser, skilled in the art and cognizant of the inventions disclosed by the applications, would recognize as a fair test of what the petitioner owned at that time. The equipment was inadequate, the men connected therewith were largely inexperienced in the operation sought to be carried out, and because of the character of equipment used, if for no other reason, the operations were carried out largely under atmospheric pressure as distinguished from the higher pressure referred to in the perfected cracking processes. On the other hand, we are of the opinion that this experiment may not be disregarded in fixing a value at March 1, 1913, since the petitioner had, in some measure at least, sought to demonstrate that which he considered was disclosed by his inventions and the result could certainly not be pronounced a success at March 1,1913.
The Commissioner also contends that at most the petitioner,had only a 60 per cent interest on March 1, 1913, in his inventions and applications for patents thereon for the reason that he had entered into a contract with one Rogers in 1907 under which Rogers had advanced $5,000 to petitioner and in consideration therefor petitioner had agreed to grant to Rogers an interest of 40 per cent in his inventions and patents thereon. The evidence largely relied upon in support of the foregoing contention is a copy of the findings of fact and conclusions of laAv which were found and decided by the Supreme Court of New York in a suit instituted in 1922 by Rogers against petitioner and the Texas Company on account of the alleged contract referred to above. By stipulation of the parties it was agreed that the copy of the said findings of fact and conclusions of law as submitted with other facts which were stipulated was a true copy, but we find nothing in the record to justify the conclusion that said copy was offered or accepted in evidence as proof of the facts therein found. In fact, at the hearing the petitioner stated “ they have asked us to stipulate the judgment in the Rogers case, and I have stipulated as to the fact, but when it is offered I am going to object. The government is not a party and if they claim Rogers *114 had- an interest in the patent, they must prove it in some other way.” No further offer was made of the said findings of fact and conclusions of law. We are of the opinion that the document referred to does not do more than establish that the New York court found certain facts and rendered that particular decision thereon. Since the parties to the two suits are different, it is not res adjudicaba in this proceeding. Southern Pacific R. R. Co. v. United States, 168 U. S. 1, and Oklahoma v. Texas, 256 U. S. 71. The further evidence offered in this connection, including the findings of the special master in the Government antitrust suit, can not be said to do more than raise an inference as to existence of the contract, but we do not consider this sufficient to overcome the proof offered by petitioner as to his ownership of the applications on March 1, 1913.
Other features were urged upon us by the respective parties as tending to show value or lack of value on the basic date in question, but it would serve no useful purpose to extend our discussion further. Suffice it to say that we have carefully considered all evidence and arguments presented and have endeavored to roach a conclusion which we think fair and reasonable. And in failing to comment more at length on the expert testimony offered by the Commissioner, we have not overlooked the high qualifications of his witnesses nor the opinions expressed by them. Nor have we attempted to assign a definite weight to any of the evidence offered, and admittedly no particular evidence or mathematical formula forms the basis of oursconclusion. The only valuation offered by the petitioner’s witnesses was that of $25,000,000, whereas the Commissioner’s witnesses testified only that there was no value. Obviously, it is not possible to reconcile these widely divergent views. The most we can say is that we are satisfied that a willing purchaser, skilled in the art with which we are concerned and fully cognizant of all conditions as they existed and were reasonably contemplated at that time, would have recognized a fair market value attaching to the applications at March 1, 1913, though we are not convinced that he would have considered "a purchase on anything like the high valuation urged by the petitioner. Too little had been proven and the hurdles to be overcome before realization thereon were too great. And, likewise, we think the petitioner, even when trading on equal terms with the aforementioned purchaser, would have gladly disposed of his rights for an amount far less than that now claimed. Of course, if we would ascribe a state of omniscience to these parties, a different conclusion might be reached, but we do not understand that we are to fix value in that way even in the little known and highly technical oil field with which we are concerned. And, too, we agree with the Commissioner that, other things being equal, the issuance of a pat *115 ent on a given application and having such patent sustained as litigation progresses from the lower to the higher courts, are important factors in adding value to such patent, but, as we stated at the outset, we do not think it is necessary for all of these events to have transpired before a fair market value may exist. Further, it might be said that, since we have no yardstick by which to measure our value in this case, whatever value we determine in excess of zero and less than $25,000,000 may be said to contain an element of speculation, but as Judge Learned Hand said in Cohan v. Commissioner of Internal Revenue, 39 Fed. (2d) 540, “It is not fatal that the result will inevitably be speculative; many important decisions must be such.” But looking at the situation as it existed on March 1, 1913, and considering all factors, both favorable and unfavorable, as well as certain and uncertain, we have reached the conclusion that the two patent applications in question had a fair market value on March 1, 1913, of $750,000.
At the conclusion of his oral argument, counsel for the Commissioner called our attention to the fact that the contract of petitioner with the Texas Company provided for the assignment of some 17 applications for patents which were filed subsequent to March 1, 1913, as well as the two applications heretofore discussed which were filed in 1909, and that the evidence of value offered relates entirely to the two applications which were filed in 1909. He accordingly urges that, since no segregation of income produced under the contract has been made, it is not possible to say whether the income derived from the contract was produced by the applications filed prior to March 1,1913, for which we have determined a fair market value on that date or from applications filed subsequent to March 1, 1913, for which there was apparently no cost to petitioner, and that therefore the determination made by the Commissioner which would subject to tax the entire amount received under the contract should be sustained. On a consideration of the entire record we are convinced that the only applications which were considered of any appreciable value under the contract were those filed in 1909. That is certainly the basis on which the case was presented by both parties in the extended hearing and the evidence in the case tends to show that what petitioner had which was of value was those applications filed in 1909. In fact, it would appear that the greater part of the value attached to one of these applications, namely, the process application. Under the first contract, executed February 27, 1919, the “ liquidated royalties ” to be paid the petitioner were to be paid “ during such time as the Company shall operate under the claims ” of the patent issued on the process application. When the supplemental or amended agreements were executed the process patent had *116 issued and it was accordingly provided that the payments under the contract were to be made during the period from January 1,1920, the date of issuance of the process patent, to the expiration of its life on January 6, 1937. Further, we think the various exchanges of reciprocal license agreements were made in large measure because of the prior rights which attached to the process application. The seven basic features referred to as disclosed by petitioner’s inventions were included in the process application. In any event, with the evidence which we have before us and after the case has been presented on the apparently agreed theory by both parties that the applications of value were those filed in 1909, we are unwilling to find for the Commissioner or order a new hearing on the mere possibility that some small part of the income accruing under the contract may have been derived from applications filed subsequent to March 1, 1913. In fact, so convinced are we that the value attaches largely to the process patent in a manner which would enable the petitioner to receive payments under the contract over the life of this patent, we are of the opinion that a subtraction should be made in each of the years before us of one-seventeenth of the fair market value which we have found for the two applications on March 1,1913. This conclusion is of course contrary to the petitioner’s contention for a return of capital (in this instance the fair market value on March 1,1913) before the payments received or any part thereof can be considered taxable income, but we do not have here a sale in the ordinary sense where the gain or loss at the date of the sale may be computed, but rather a transaction through which the amount to be received is indeterminate and uncertain and the benefits under the contract may flow to the petitioner over a period of years.
The correct view, we think, under the circumstances of this case, is that the petitioner had property on March 1, 1913, of a fair market value now determined by us; that, through the execution of a contract in 1919 by which the property was sold and assigned to the Texas Company, the petitioner would receive income over a period of years not greater than the life of the process patent; and that in the absence of better evidence as to a more equitable means of providing for the return of the capital involved, a subtraction should be made in each of the years here in question of $44,117.65 (one-seventeenth of $750,000).
Reviewed by the Board.

Judgment will be entered under Bule 50.

MttRdock concurs in the result only.